**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                            **Criminal Case No.: 1:20-CR-95**
                                       **(JUDGE KLEEH)**

**AARIC MURRAY, and**
**RICHARD KIRKLAND JOHNSON,**
        **Defendants.**

### REPORT AND RECOMMENDATION RECOMMENDING THAT DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 53] BE DENIED

Presently pending before the undersigned Magistrate Judge is Defendant Aaric Murray's Motion to Suppress, [ECF No. 53], filed on July 2, 2021. By Order dated July 6, 2021 [ECF No. 55], United States District Judge Thomas S. Kleeh referred the motion to the undersigned to enter a report and recommendation as to disposition of the motion.

The undersigned would note that on July 6, 2021, Defendant Richard Kirkland Johnson filed a Motion to Adopt Co-Defendant's Motion to Suppress Evidence, [ECF No. 56], which was subsequently granted by Order, [ECF No. 58].

The undersigned also is in receipt of the Government's Response to Defendant's Motion, filed on July 8, 2021, [ECF No. 62], and Defendant's supplemental Memorandum in Support of Defendant's Motion to Suppress Evidence, filed with leave on August 5, 2021, [ECF No. 68]. The undersigned conducted a hearing on suppression motion on August 19, 2021, at which time the Court heard witness testimony, accepted exhibits into evidence, and heard the argument of counsel for both Defendants and the Government.

Based on a detailed review of Defendant's Motion, [ECF No. 53], Memorandum in Support thereof, [ECF No. 68], the Government's Response [ECF No. 62], the exhibits introduced, the

testimony provided, and the oral argument offered by counsel, the undersigned **RECOMMENDS** that Defendant's Motion be **DENIED** as set forth herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On February 2, 2021, a Grand Jury returned an eight-count superseding indictment which accused Defendant Aaric Murray ("Murray") and Defendant Richard Kirkland Johnson ("Johnson") in Count One with Conspiracy to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846, in Count Two with Aiding and Abetting the Possession with Intent to Distribute Methamphetamine, in violation of Title 18, United Stated Code, Section 2 and Title 21, United States Code Sections 841(a)(1) and 841(b)(1)(C), in Count Three with Aiding and Abetting the Possession with Intent to Distribute Heroin, in violation of Title 18, United Stated Code, Section 2 and Title 21, United States Code Sections 841(a)(1) and 841(b)(1)(C), in Count Four with Aiding and Abetting the Possession with Intent to Distribute Cocaine Base, in violation of Title 18, United Stated Code, Section 2 and Title 21, United States Code Sections 841(a)(1) and 841(b)(1)(C), and in Count Six with Aiding and Abetting the Possession of Firearms in Furtherance of a Drug Offense, in violation of Title 18, United States Code, United States Code, Sections 924(c)(1)(A)(i) and 2.

Counts Five and Eight solely name Murray with the offenses of Unlawful Possession of a Firearm, in violation of Title 18, United States Code Sections 922(g)(3) and 924(a)(2). Count Seven solely names Johnson with the offense of Possession with Intent to Distribute Fentanyl, in violation of Title 21, United States Code Sections 841(a)(1) and 841(b)(1)(C).

On April 16, 2020, at 5:33 a.m., MECCA 911 received a call from Eddie Emery reporting that a man nicknamed "Seven" had taken his wife, Tara Emery, hostage at gun point over a dispute related to a rental car. Deputies Ward, Fitzwater, and Alexander with the Monongalia County

Sheriff's Office ("MCSO") were dispatched to the reported trailer residence – 536 Independence Hills Village, Morgantown, West Virginia 26501 – for a welfare check. As deputies approached the residence, they observed a grey-silver vehicle outside. Deputies called in the vehicle's information; 9-1-1 dispatch confirmed it was a rental vehicle registered to Enterprise. Deputies Ward and Fitzwater approached the front of the trailer with weapons drawn; Alexander covered the exits at rear of the trailer. Deputies were unable to see into the trailer because the windows were internally covered by blanket and plastic.

Deputies knocked on the front door and announced their presence. An unknown individual immediately responded: "who is it?" After a few moments, Murray answered the door and exited the trailer. Deputy Ward ordered Murray to face the trailer and place his hands over his head; Murray was immediately placed into handcuffs and detained. Deputy Ward explained to Murray he was not under arrest and that deputies were investigating a call that someone was being held hostage at gunpoint by Murray at this residence. Deputies called a second occupant out from the back hallway of the trailer onto the porch; the man was detained, handcuffed, and later identified as Johnson.

Deputy Ward asked Murray: "Can we step inside out of the cold real quick, guys?" Murray answered "yeah," and "no one is bein' held hostage." Deputies as well as the handcuffed suspects, Murray and Johnson, entered into the trailer.

Deputy Ward directed Murray to step into an open room on the right which was visible from the entryway – "let's step in here, man." Murray responds "okay," walks into the room and takes a seat at a chair in front of a table. Deputy Ward observed in plain view drug distribution paraphernalia around the room and on the table in front of Murray, including digital scales, baggies with their corners cut, white powdery residue, a paddle holster to a firearm, gloves, rubber bands,

3

baking soda, cutting agents, ledgers, and notebooks. On the floor near a backpack, to the right of where Murray was sitting, Deputy Ward observed what he believed to be a large bag of crack cocaine.

Deputy Ward then performed a walk-through of the residence, with permission from Murray, to search for the purported female hostage victim. No such female was found. Deputy Ward stepped outside the residence and called Lt. Todd Forbes of the Drug Task Force to report the observed drug distribution evidence and ask whether to pursue the narcotics investigation.

Deputy Ward returned inside the residence to question Murray. Deputy Ward recited the Miranda rights to Murray and asked if he understood his rights. Murray indicated "yeah" that he did. Ward asked Murray some questions about Tara Emery and the relationship between Mrs. Emery and her husband. Next, Ward asked Murray if he was ready to talk about the "elephant in the room." Ward gestured to the table and clarified for Murray that he meant "the cutting agent, the baggies . . . the big wad of cash in your pocket." Murray responded, "my girlfriend uses."

Ward directed Alexander, who was now inside the residence and already wearing gloves, to perform a search of Murray to ensure he wasn't concealing any other contraband on his body. Murray Told Alexander that he had approximately $4,000 on his person. Murray continued to converse with and field questions from deputies. Deputies discovered Murray had an active capias warrant on shoplifting charges from Westover, West Virginia; Murray was arrested and taken back to the police station by Deputy Ward.

MCSO deputies secured the scene then sought and obtained a search warrant for the residence[1] and the rental vehicle[2] from state magistrate Hershel R. Mullins. The search of the residence yielded several guns, some of which were stolen, approximately an ounce of

---

[1] *See* Government's Exhibit No. 3, Search Warrant for Residence. [ECF No. 71-2].
[2] *See* Government's Exhibit No. 4, Search Warrant for Vehicle. [ECF No. 71-3].

methamphetamine, several grams of crack cocaine, a little over $9,000 cash, as well as the previously described drug distribution paraphernalia. Johnson was also arrested and taken back to the police station.

A federal Criminal Complaint was filed against Murray on November 12, 2020. An Indictment was returned by a Grand Jury against Murray on December 1, 2020, and the Superseding Indictment, as described above, was subsequently returned by a Grand Jury against Murray and Johnson on February 2, 2021.

In his Motion to Suppress, Defendant Murray argues that all evidence seized should be suppressed because deputies failed to obtain a search warrant or valid consent prior to entry into his residence. Murray asserts that, after being detained at gunpoint and handcuffed, deputies brought Murray back inside the trailer under the pretext that it was too cold outside; Murray argues he was not given a meaningful opportunity to consent to or deny the entry into his home. Because this allegedly unlawful entry resulted in the plain view observation of the evidence which was eventually seized and presented as the basis for the charges in this case, Murray seeks the suppression of all evidence seized from the trailer on April 16, 2020. Murray also argues all possibly incriminating statements provided to deputies on April 16, 2020 must likewise be suppressed as the statements were provided during an improper detention where Defendant Murray was under duress and not properly advised of his rights. Defendant Johnson adopts Defendant Murray's Motion to Suppress Evidence.

In its Response, the Government argues that exigent circumstances supports deputies actions upon arrival. At oral arguments, described more fully herein, *infra* at 21, the Government additionally argued that valid consent was provided by Murray to the officers for entry into the home.

The issues before the Court are (1) whether deputies' entry into the trailer, which resulted in plain view observation of material evidence later seized, was constitutionally permissible under the totality of the circumstances, due to exigent circumstances and/or valid consent provided; and (2) whether statements made by Defendant were made under duress, without legal advice and without proper explanation or understanding of his legal rights.

## II. SUMMARY OF TESTIMONY AND EVIDENCE

During the aforementioned suppression hearing on August 19, 2021, the Court heard sworn testimony from one witness, Deputy Joshua Ward of the Monongalia County Sheriff's Office. The Court also heard oral argument from the parties.

At the suppression hearing, the Court received into evidence the following: (1) Government's Exhibit No. 1, Deputy Joshua Ward's Body Camera Footage; (2) Government's Exhibit No. 2, Deputy Joshua Ward's Case Report, [ECF No. 71-1]; (3) Government's Exhibit No. 3, Search Warrant for Residence, [ECF No. 71-2]; (4) Government's Exhibit No. 4, Search Warrant for Vehicle, [ECF No. 71-3]; and (5) Joint Exhibit No. 1, CAD Report, [ECF No. 71-4].

### A. Testimony of Deputy Sheriff, Sergeant Joshua Ward

According to his testimony at the suppression hearing,[3] Deputy Joshua Ward has approximately ten (10) years' experience as a law enforcement officer, with the past seven years spent with the Monongalia County Sheriff's Office. [11:42:34-11:43:02]. He presently serves as a sergeant on the midnight shift patrol, having worked midnight shifts for the past six and a half (6.5) years. [11:43:03-11:43:16].

---

[3] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on August 19, 2021, which is located on the platform of the Court's intranet site for FTR recordings.

Deputy Ward testified he has approximately four to five years of familiarity with Murray. [11:46:04-11:46:14]. He has had several past encounters with Murray, including responding to calls where Murray was present as well as personally arresting or executing arrest warrants on Murray on two or three prior occasions. [11:44:10-11:44:29]. During one encounter, Ward was threatened by Murray. [11:44:30-11:44:39]. In this instance, deputies were attempting to serve a capias arrest warrant on Murray when Murray, who had been sitting on a flight of stairs, stood up and brought up a loaded heroin needle, which Murray was clutching, up and towards Ward in a threatening manner. Ward attributes Murray's threatening actions to the fact that Murray was under the influence at the time of the encounter. [11:44:40-11:46:03].

Ward also testified there have been firearms involved in past encounters where Murray was present, though Murray was not the individual wielding or carrying the firearms in those instances. [11:46:15-11:46:35]. One such instance was a shooting at Woodland Terrace, where Murray was present, though he was not the shooter. [12:28:33-12:28:49]. Ward testified that, generally speaking, Murray has been soft spoken, courteous and not aggressive in his encounters with law enforcement. [12:28:50-12:29:05].

On April 16, 2020, Deputy Ward was working midnight shift when around 5:40 a.m. he was dispatched to 536 Independence Hills Village. [11:43:17-11:43:49]. The basis for the dispatch was that a male caller reported that his wife was being held hostage at gunpoint by a man named "Seven" due to a dispute over a rental car. Deputy Ward testified that officers knew "Seven" to be the nickname of Murray. [11:43:41-11:44:09]. Ward was dispatched to the scene along with Deputy Fitzwater ("Fitzwater") and Sgt. Alexander ("Alexander"). Fitzwater met Ward at the entrance of the Independence Hills Village, and, together, they waited for Alexander to arrive. After Alexander arrived, the deputies walked up to the residence together. [11:46:36-11:47:01].

Approximately fifteen minutes elapsed between the time of the dispatch and arriving at the residence at Independence Hills Village. Deputies tried to call back the 9-1-1 caller several times to get more information before approaching the residence but were unable to make contact. [11:47:02-11:47:39]. Ward described that it was dark and cold outside, approximately thirty degrees that morning. [11:47:40-11:47:50].

Deputies first identified the number on the residence, then observed a silver car in driveway. Ward called in the license plate number to dispatch and confirmed it was a rental vehicle. The vehicle matched the details provided by the 9-1-1 caller about a female being held hostage over a rental car dispute. [11:47:51-11:48:15; 11:52:15-11:52:20].

Next, Alexander went behind the trailer to cover the rear exits, while Deputies Fitzwater and Ward approached the sides and front of the trailer residence and began looking into the windows. The windows appeared to be covered with blankets and plastic, making it impossible to see inside. [11:48:16-11:48:42; 11:52:45-11:52:55]. Ward and Fitzwater knocked on the front door of the residence and announced their presence. [11:48:43-11:48:44; 11:53:27-11:53:30]. Ward was wearing a body camera which captured the encounter.[4] [11:48:45-11:49:55].

An individual inside the residence responded immediately "Who is it?" [11:53:31-11:53:42]. Ward could hear people moving around inside the residence, but he was uncertain why they were not responding immediately. [11:53:55-11:54:14]. Ward was concerned by the delayed response; he had concerns about officer safety, possible flight of suspects, and the health and welfare of any hostage(s) on the inside. Ward attempted to take some minimal cover in case someone exited the residence with a weapon. Ward had his weapon drawn. [11:54:23-11:55:13; 12:43:00-12:43:09]. Fitzwater was nearby, to Ward's left. [11:55:14-11:55:31]. Alexander was

---

[4] *See* Government's Exhibit Number 1, Deputy Joshua Ward's Body Camera Footage.

still behind the residence in case someone attempted to flee from the rear. [11:55:32-11:55:36]. Due to the cold weather conditions, Alexander was wearing a heavy winter jacket, toboggan, and uniform. [12:13:17-12:13:49].

As described above and explored in greater detail below on cross examination, deputies entered the trailer, observed the drug distribution paraphernalia, searched the home for possible hostages, and then, Deputy Ward exited the trailer to call 105.

Deputy Ward testified that he placed a call to 105, specifically calling the unit number of Lieutenant Todd Forbes of the Drug Task Force. [12:03:13-12:03:25]. Deputy Ward intended to tell Lt. Forbes about the items he observed in plain view, including digital scales, baggies with their corners cut, white powdery residue on the table, a paddle holster to a firearm, gloves, rubber bands, baking soda, cutting agents, ledgers, and notebooks. Deputy Ward testified these items combined usually indicate an area where someone is processing drugs for distribution. [12:03:26-12:04:28]. Deputy Ward noticed the cutting station immediately upon entering the residence. [12:04:29-12:04:36]. Ward testified that to the right, on the floor, near a backpack, near the cutting station and not far from where Murray was sitting, was a large bag of crack cocaine, [12:04:36-12:05:11]. Ward testified he has had experience working in narcotics investigations and can often recognize drugs by sight. [12:05:12-12:05:24].

In his phone call with Lt. Forbes, Ward asks if they should pursue investigating or ignore the evidence of drug distribution. Ward testified that the reasoning behind the question was Ward did not want to sabotage a large, ongoing drug task force investigation. [12:08:16-12:08:48].

Ward asked Murray about the "big wad of cash" in his pocket. Ward knew Murray had cash in his pockets because earlier he had pat down Murray and felt what appeared to be several wads of cash in his pockets. [12:11:09-12:11:20]. Ward testified that he had to check Murray's

"29 Status," which is a local warrant check to see if he has any locally issued warrants. [12:11:58-12:12:18]. There was an outstanding capias warrant for Murray for shoplifting, which officers executed and proceeded to take Mr. Murray back to the police station to be processed based on that warrant. [12:19:48-12:19:57; 12:20:50-12:20:56]. Murray asked about the money to be seized. [12:19:58-12:20:15]. At one point, Murray asked Ward for a blanket because it was cold, and Ward grabbed one for him. [12:15:23- 12:15:29; 1:00:50-1:00:58].

Deputy Ward prepared a case report[5] memorializing the events which transpired on April 16, 2020. [12:20:57-12:21:05]. Deputy Ward also prepared a search warrant for the residence,[6] 536 Independence Hills Village, as well as a search warrant for the rental vehicle,[7] a Grey Dodge Charger, bearing Florida registration and registered to Enterprise Rental Cars.[8] [12:21:29-12:23:25].

Deputy Ward testified that deputies executed the search warrant that same day. [12:23:25-12:23:43]. When executing the search warrant on the residence, deputies found several guns, some of which were stolen, approximately an ounce of methamphetamine, several grams of crack cocaine, a little over $9,000 cash, ledgers with equations and purchase records, as well as all items previously described on the cutting station. [12:23:44-12:24:45].

Deputies also executed the search warrant on the rental vehicle. Inside the rental vehicle, deputies found baggies with methamphetamine residue in them as well as a knife found between driver seat and center console. [12:24:46-12:25:14].

---

[5] *See* Government's Exhibit Number 2, Case Report. [ECF No. 71-1].
[6] *See* Government Exhibit Number 3, Search Warrant for Residence. [ECF No. 71-2].
[7] *See* Government Exhibit Number 4, Search Warrant for Vehicle. [ECF No. 71-3].
[8] The parties stipulated on record that the exhibits presented at the hearing are the same exhibits as those previously provided to Defendants in discovery.

On cross examination by counsel for Defendant Murray, Ward testified that the air temperature was uncomfortable but not an emergency that made him go inside the trailer. [12:25:29-12:25:46]. Ward testified that he was the lead deputy dispatched to respond to this call. [12:25:47-12:25:56]. Ward testified that he was told the following information regarding the call when dispatched: a female's husband had called and told 9-1-1 that his wife was being held hostage at gun point by "Seven" regarding some dispute over a rental car; Mr. Emery was caller; Tara Emery was his wife and the alleged victim. [12:25:57-12:26:28]. Ward testified that, based on his experience working in Monongalia County, he was familiar with Mr. and Mrs. Emery by name, but did not know them personally. Ward testified he took the call as seriously as any other call for service. [12:26:29-12:26:58; 12:46:30-12:46:38].

Deputy Ward acknowledged his conversation with Murray and statements that it was possible Tara Emery was trying to extort money out of her husband and that was her motivation in initiating calls to her husband. Ward testified he had these suspicions particularly after Tara Emery was discovered not to be present in the home. [12:26:29-12:27:16].

Deputy Ward testified he was on regular patrol on this evening and for this call. [12:27:17-12:27:45]. Deputy Ward testified that he is trained in hostage negotiations and is part of a SWAT Team. [12:27:46-12:27:54]. Deputy Ward testified that this response by patrol is a normal response prior to confirming that there is, in fact, a hostage situation with a gun. [12:27:55-12:28:03]. Part of the reasoning is that there are limited resources in Monongalia County, particularly on midnight shift, so deputies do not call for a SWAT Team and hostage negotiators without confirming the details and veracity of the situation. [12:28:04-12:28:27]. Ward approached the residence thinking this could be a "real deal" hostage situation, especially considering his past experiences with Murray, including the Woodland Terrace shooting. [12:28:28-12:28:32; 12:28:33-12:28:49].

Deputy Ward testified that he knocked and announced his presence and, for reasons unknown, it took a few moments for Murray to answer the door. [12:29:06-12:29:11]. When Murray opened the door, he saw Ward holding him at gunpoint [12:29:12-12:29:20]. Then, Ward immediately begins giving commands, such as "come outside," and "turn away from me." [12:29:21-12:29:26]. Ward recognized in his testimony that he placed Murray into a vulnerable position where he was at the deputies' mercy. [12:29:26-12:29:31]. Ward directed Murray to place his hands on top of his head, and Murray began to comply and to do so, but he was slow in pulling his hands up and slow in his movements. [12:39:32-12:29:41]. Deputy Ward testified that in his training and experience when individuals are slow or hesitant in following commands, it could mean that they are rethinking complying with officers. [12:29:42-12:29:50]. Ward acknowledged that Murray did not have a weapon, did not act aggressively, nor did he resist in any sense. [12:29:51-12:29:59]. Ward testified that he began shouting  "ON TOP OF YOUR HEAD," and the purpose of such shouting is to provide directions so loudly that officers can ensure the subject hears their commands. [12:30:00-12:32:00]. Ward testified after holding Murray at gun point, then shouting commands at him, Ward immediately cuffed Murray. [12:32:01-12:32:25]. Ward told Murray why deputies were there while he was cuffing Murray. [12:32:26-12:32:32]. Ward testified he expects complete submission from a subject to whom he gives commands, including where the subject puts his hands and where the subject stands. [12:32:33-12:32:44].

Then, Ward testified he asked Murray to go inside the trailer. [12:32:45-12:32:49]. Part of the explanation for going inside the trailer was that it was cold outside. [12:32:50-12:32:55]. Ward testified that if Murray had said no, deputies would not have went into the trailer. [12:32:56-12:33:03]. Ward testified that Murray was no longer at gunpoint when he was asked if they could step inside the trailer, but he conceded that Murray probably could not see if he was still being

held at gunpoint. [12:33:04-12:33:12]. Ward testified that at that point, however, Ward's tone had changed, the situation had calmed down, and Murray and Ward were engaging in conversation. [12:33:13-12:33:35]. Ward testified that after Murray said, "come on in, there's no one being held hostage here," Ward and Murray began to step through the threshold into the entrance of the trailer, which was a somewhat tight space. [12:33:36-12:34:05]. Ward testified that he saw a chair sitting next to a table in the room to the left, and, in order to get Murray out of the congested entrance area and out of the cold, Ward directed[9] Murray to go sit in the chair. [12:34:06-12:34:44].

Ward testified that deputies are not trained that a specific race may be more afraid of law enforcement officers than another. [12:35:31-12:35:58]. Ward acknowledged, however, that this may be a legitimate concern that a subject who is a minority might have. [12:25:59-12:36:18]. Ward testified he did not believe he created a coercive environment where Murray really did not feel he had the option to agree or disagree, consent or not consent, freely. [12:36:19-12:36:29].

Ward testified that soon after, he performed a search of the residence, in order to try to find a hidden person or hostage, and no such hostage was found. His search including a look inside both the washer and dryer. Ward testified his reasoning for the searching in the appliances is because he has found people hiding from law enforcement inside a dryer before. Held hostage s or hidden occupants were found. [12:36:41-12:36:45; 12:01:23-12:01:32; 12:36:30-12:36:41]. At this point, after the search, Ward felt that the alleged emergency which he was called out for originally did not exist. [12:36:46-12:36:57].

Ward then went outside to call 105. Because the hostage situation did not exist, Ward could now consider and focus on the possible drug investigation. [12:36:57-12:37:14;12:37:53-

---

[9] Ward specifically testified that he asked Murray if he wanted to go in, "why don't we go in here," and sit on the chair. However, Ward then stated he couldn't remember his exact words. [12:34:45-12:34:58]. Ward testified he was making suggestions, not commands. [12:34:59-12:35:31].

12:38:02]. Ward asked 105 if he should ignore what he had seen in regard to drugs. [12:37:15-12:37:22]. Ward told 105 that he saw a baggie which might have crack, but he didn't know. Ward testified he did not know if it was crack because he had not closely inspected the substance, but it appeared to him to be crack. [12:37:23-12:37:40]. Ward testified he saw a baggie on the TV stand, a baggie on the floor, and several baggies on the table. [12:37:41-12:37:52].

Ward testified that he did keep Murray in handcuffs. [12:38:03-12:38:06]. However, Ward's gun was in its holster at this time. [12:38:07-12:38:12]. Murray was still seated. [12:38:13-12:38:29].

Ward did not tell Murray they had cleared the emergency, nor did he tell Murray he's free to go. [12:38:30-12:38:37]. Ward testified Murray was not free to go as he was being detained for drug investigation. [12:38:38-12:38:43].

Ward provided Murray with his Miranda rights, reciting the rights in the same rendition and cadence he regularly does. Ward was not certain if he recited the Miranda rights faster than he had been speaking before. [12:38:44-12:39:15]. Ward testified he has s said the Miranda rights so many times there's a cadence to how he says it because of how he memorized them. [12:39:16-12:39:31]. Ward testified he did stop between elements and ask Murray if he understood or had any questions. [12:39:31-12:39:40].  Ward asked Murray afterwards if he understood his rights. [12:39:41-12:39:50]. Ward did not ask if Murray was willing to waive those rights. [12:39:51-12:39:53]. Ward continued to question Murray throughout their time in the trailer, while Murray was in Ward's cruiser, and later at the patrol station. [12:39:54-12:40:00]. Ward never reduced the Miranda rights to writing in this instance. [12:40:06-12:40:13]. Ward was not aware if Murray had any legal counsel at this time. [12:40:14-12:40:27]. Ward told Murray over and over again he was detained and not arrested. [12:40:28-12:40:36]. Ward testified that Murray was always in custody

14

after Murray opened the door and contact was made. [12:40:37-12:40:47]. Ward previously questioned Murray about the hostage situation, then mirandized Murray before talking to him about the drugs. [12:40:48-12:41:09].

In his case report,[10] Ward indicates that Murray admitted he was a drug user. Ward testified that Murray told him that on the ride back to the station. [12:41:10-12:41:34]. Ward also testified that based on his experiences with Murray, including finding Murray in possession of drugs several times, Ward has established that Murray is a drug user. [12:41:35-12:41:49]. Ward didn't remember where exactly in his report he called Murray a drug user. [12:41:50-12:42:00]. Ward testified that he and Murray had a conversation on the way back to the station where Murray said, "I'm just a drug user, man, I don't sell drugs." [12:42:02-12:42:11]. Ward testified that Murray started to say this when Ward was walking him out to the car. [12:42:12-12:42:16]. On a number of occasions, Murray said he had a girlfriend who used. [12:42:12-12:42:26]. Ward testified that if he put a statement from Murray into his report, then he believes its what Murray said to him. [12:42:27-12:42:36].

When Ward returned to execute the search warrant, the bag of crack cocaine on the floor was field tested and also had the appearance, color, and feel of crack cocaine. [12:43:15-12:43:41]. To the best of his training, Ward believe the material to be crack cocaine, but he is uncertain if lab results ever confirmed the same. [12:43:41-12:43:52].

Murray told Ward he was living in the trailer; Ward was unsure if Murray owned the trailer. [12:43:53-12:44:01]. Ward never researched and confirmed who the trailer belonged to, whether the utilities were in Murray's name, whether anyone else other than Johnson had been living there,

---

[10] *See* Government's Exhibit Number 2, Case Report. [ECF No. 71-1 at 6 ("I told Murray I already saw drugs. Murray again acknowledged the presence of the drugs by stating it was all personal use.")].

or who might have come and gone through the residence in the day or two prior to deputies' search. [12:44:02-12:44:33].

On cross examination by counsel for Defendant Johnson, Ward testified that he was on call on April 16, 2021, when he got a call from the 9-1-1 center. [12:44:54-12:45:03]. The 9-1-1 dispatcher advised it was a "welfare check" for a female possibly being held hostage at gunpoint by a male named "Seven" over something to do with a rental car. [12:45:04-12:45:18; 12:46:20-12:46:29].

The classification of a call as a "welfare check" by a 9-1-1 dispatcher is rather broad; it can include calls with requests to check on a family member to calls with emergency situations where someone is at risk of losing their life. [12:45:19-12:45:47]. There is likely an option for classifying a call as a hostage situation, but Ward testified again that the classification of a call for dispatch is decided by the 9-1-1 dispatcher and here, the dispatcher chose the welfare check classification. [12:45:48-12:46:07]. Ward testified that dispatch had told him that the husband hadn't seen his wife for a while, and the wife was being held at gunpoint. [12:46:39-12:47:02]. Ward testified he didn't know where the caller had gotten the information about his wife being held hostage. [12:47:03-12:47:07].  Ward could not recall the exact details of what was dispatched without listening to the actual dispatched recording or seeing the notes of the CAD Report.[11] [12:47:08-12:47:38].

Upon review, the CAD Report stated that the caller advised that his wife was being held at gunpoint and he "last spoke with her just before her call to 9-1-1." [12:50:22-12:51:17]. Ward testified that he recalled seeing the information about when the caller last spoke to his wife on the CAD Report, but he didn't remember being dispatched this information. [12:51:18-12:51:25].

---

[11] See Joint Exhibit No. 1, CAD Exhibit. [ECF No. 71-4]. [12:47:39-12:48:28; 12:49:28-12:49:45].

Ward testified that the CAD Report is not always an accurate reflection of what information is sent over by dispatch. [12:51:26-12:51:46]. Ward could not recall what all was included in the dispatch. [12:51:47-12:51:51]. Ward testified that the CAD Report includes shorthand of what the 9-1-1 dispatcher is processing and putting into the computer. [12:51:52-12:52:06]. The caller's name is reflected on the CAD Report and the caller's name and phone number was provided to Deputy Ward. [12:52:07-12:52:23].

The phone number for the wife is listed on the CAD Report. [12:52:24-12:52:32]. Ward testified that deputies called both 9-1-1 caller and the wife multiple times and did not receive a response from either. [12:52:33-12:52:47]. Ward testified that deputies tried to call the numbers while driving to the scene and before all deputies had arrived; Ward testified he tried to call several times while he and Fitzwater were waiting in the car for Alexander to arrive. After Alexander arrived, they made the decision to approach the residence. [12:52:48-12:53:09].

Ward testified that as he was approaching the residence he observed a vehicle in the driveway, he called the vehicle's registration into dispatch to get more information, and MECCA 9-1-1 dispatch confirmed that the vehicle in question was a rental vehicle registered to Enterprise. [12:56:51-12:57:01; 12:53:09-12:53:46]. Ward testified there are numerous why deputies run registrations of vehicles when they approach residences. [12:53:47-12:54:02]. Deputy Ward testified that, here, 9-1-1 dispatch reported to deputies that the dispute was over a rental car, so when the registration came back to a rental car, that fact gave more credibility to the 9-1-1 call. [12:54:03-12:54:14].

Deputy Ward testified that the inquiry for the vehicle registration was called out by radio transmission to MECCA 9-1-1, the same service who provided prior dispatch. Ward explained that WV-28 is code for "I want to run a West Virginia vehicle registration." [12:54:14-12:54:41]. Ward

initially testified that the dispatcher did not log his vehicle registration call-in on the CAD Report, but that it could be heard on the video. [12:54:58-12:55:26]. Ward testified that dispatch told him that the registrant for the vehicle was EAN Holdings, which is Enterprise Rental Cars. [12:55:27-12:55:45]. The CAD Report reflects and confirms that EAN Holdings is the individual Florida registrant for the vehicle. [12:55:46-12:56:15].[12] Ward again testified that the time of the registration inquiry on the CAD Report is off from the actual time of the inquiry, and that's not uncommon for the CAD Report to be unreliable as to what gets relayed to deputies, what gets relayed back, and at what times entries are eventually placed on to the CAD Report. [12:56:16-12:56:50].

Ward testified that when approaching the trailer, he looked around to see if there were any outward signs of a woman being present at the residence, such as women's clothing, and saw no such signs. [12:57:22-12:57:51; 12:58:08-12:58:13]. He testified that he also observed no signs of struggle outside, nor did he hear any cries for help [12:57:52-12:58:07]. Ward testified that the trailer-residence was not a huge home; it was only one floor. [12:58:14-12:58:23]. Ward testified that he could hear people rustling and moving inside the trailer, so if a struggle was happening, Ward likely would have heard it from outside the trailer, and he did not heard anything. [12:58:24-12:58:36].

Ward knocked at the door then someone responded, "Who is it?" [12:58:37-12:58:49]. After a few moments, a little bit of time had passed, someone answered the door. [12:58:50-12:58:58]. Murray then answered the door. [12:58:59-12:59:05]. When given commands by Ward upon answering the door, Murray complied. [12:59:06-12:59:10]. Whenever Mr. Johnson came out, he complied with Ward's commands as well. [12:59:11-12:59:15].

---

[12] *See* Joint Exhibit No. 1, CAD Exhibit. [ECF No. 71-4].

Ward expressed concerns regarding officer safety about how long it took the individuals to get to the door. Although, he recognized that at approximately 5:40 a.m., there could be innocuous reasons for a person to be slow in answering a door, such as taking time to wake up and/or put clothing on. [12:59:16-1:00:03].

It was around thirty (30) degrees outside. [1:00:04-1:00:19]. Ward testified on cross that he can handle standing outside in the cold and he does so for various duties while on patrol. [1:00:20-1:00:26].

Ward noticed there was renovation work being done to the home. [1:00:27-1:00:32]. Ward testified he did not know the utility situation within the home or whether there was heat in the house. [1:00:33-1:00:39; 1:00:45-1:00:50]. Ward testified that it was warmer in the house than it was outside. [1:00:40-1:00:44].

Ward testified he did not ask to go inside to look for the girl. Ward asked to come inside and added that it was cold outside. [1:00:59-1:01:23]. Ward testified he wanted to get everyone on scene as comfortable and as safe as possible, knowing that Murray and Johnson were uncomfortable enough with it being 5:40 in the morning, them possibly just waking up, and it being cold outside. Ward testified, however, that another reason he went inside was to see if anyone was being held hostage inside. [1:01:24-1:02:00]. Ward did not tell Murray or Johnson his reasoning for wanting to go inside; he just asked to go inside. [1:02:00-1:02:05].

Ward confirmed he could have detained everyone in cruisers until a search warrant was obtained, but that would have required deputies to walk away from and leave the residence location which posed a risk if there was, in fact, a hostage inside who was hurt or another unknown suspect inside. [1:02:06-1:02:50]. Ward testified they didn't have enough resources or manpower to send one deputy back to the police vehicles while securing Murray and Johnson and the scene. Ward

also testified that upon entry, he had probable cause for the drug investigation because he could see everything sitting out in plain view. [1:02:51-1:03:32].

Ward testified that when he walked into the trailer, there was a large open room to the left and a large open room to the right, with furniture in it, and on the floor in the room to the right, between a desk chair and a couch, Ward observed a baggie on the floor [1:03:33-1:04:39]. This baggie was on the floor right next to where Murray was sitting. [1:04:40-1:04:49]. The baggie contained an unknown white substance. [1:05:00-1:05:08]. Ward testified there was a small bag of crack on the TV stand and a large bag of crack on the floor. [1:05:49-1:05:56].

A larger bag with controlled substances was later retrieved pursuant to the search warrant. It was retrieved from a pants' pocket that was found inside the West Virginia backpack located on the floor. [1:05:09-1:05:48; 1:05:57-1:06:04].

On redirect, Deputy Ward testified that it is possible one of the reasons it was cold inside the house was because the door was left open. [1:06:34-1:06:43]. Deputy Ward testified that there were past interactions with Murray which lead him to believe he should be cautious with Murray – such as the incident with the loaded heroin needle and the prior shooting incident. [1:06:45-1:07:12]. Ward testified that Murray did not say no when Ward asked him to step inside the house, nor did Murray indicate in any way that he did not want to go into the house. [1:07:13-1:07:30]. Ward testified that regardless of a subject's race, he approaches encounters daily with the mindset that "as an officer, I need to be afraid." [1:07:31-1:08:04].

On recross, counsel for Defendant Murray asked whether it was Deputy Ward's intention to enter Murray's trailer to see if he could obtain something to serve as a basis for probable cause. [1:08:20-1:09:03]. Deputy Wards answered that it was not. He explained that it was his intention to enter the trailer to see if there was a hostage inside the trailer. [1:09:03-1:09:09]. Ward

confirmed that after speaking with 105 on the telephone, returning inside the trailer, and asking Murray about the "elephant in the room," the investigation has shifted from a hostage investigation to a drug investigation. [1:09:10-1:09:31].

### B. Oral Argument

At the hearing, counsel for the parties provided oral argument as to the motion to suppress.

The Government argued that both exigent circumstances and consent provided by Murray justified officers' entry into and search of the residence. The Government asserted that once inside, officers observed drugs in plain view which provided sufficient probable cause, and thus, all subsequent searches were constitutionally permissible.

The Government specified that the exigent circumstances independently justified the officers' entrance and search of the home as officers needed to enter the home to search for the reported hostage, who may be at risk of harm. The Government urged this is especially the case where the phone call reporting the emergency hostage situation was not an anonymous call, but rather, a call by a known Mon. County resident, who provided call-back numbers for both he and his wife, where officers investigation at the scene, such as the discovery of the rental vehicle, corroborated the call, and where officers were unable to see inside the residence due to coverings on the window. The Government urged that there is an expectation that officers must investigate an emergency call such as this one and cannot accept the alleged kidnapper's version of events upon questioning and return to the station without searching the residence.

The Government also argued that Murray provided clear consent to officers for their entrance into the home. The Government further argued that Murray's conversation with officers was voluntary and that officers properly mirandized him before questioning him about the drugs observed. The Government, therefore, renewed its request that the Motion to Suppress be denied.

Counsel for Defendant Murray urged the Court that proper consent could not have been provided under the circumstances. Counsel asserted the disorienting time of the morning, setting, and the shouting of commands at gunpoint negated Murray's ability to meaningfully, knowingly, and voluntarily provide consent to officers for a search the residence or choose to make statements to officers or remain silent. Counsel argued that even if <u>Miranda</u> rights were technically provided, exclusion of all statements is warranted where <u>Miranda</u> rights were regurgitated with such speed as to preclude true understanding of said rights and where the situation is inherently coercive. Furthermore, counsel noted his objection to Ward's statement in his report that Murray admitted he was a drug user. The Court would note it was unable to find such statements on any of the body camera footage, though audio quality was a problem at times.

Additionally, counsel for Defendant Murray argued that the response by officers in responding to the call and approaching the trailer evidences the truth that officers knew a kidnapping was not actually occurring and that exigent circumstances did not exist. Counsel for Defendant Murray further argued that even if there were exigent circumstances based upon the call, those exigent circumstances evaporated soon upon arrival.

Counsel for Defendant Johnson added that, in regard to consent, no reasonable person in same situation as Murray would feel as if they have a choice to do anything other than comply with police under these circumstances. Counsel noted that, at approximately 5:40 a.m., Murray was detained and placed in handcuffs, had a gun pointed at him, and was in a state of duress and concern, when he complied with officers' requests to enter the home. Counsel asserted there was no informed consent here. Furthermore, counsel urged that even if Murray gave consent for officers to step inside and enter the unfinished foyer area of the home, officers exceeded the scope of the consent by directing Murray into the right room.

Furthermore, counsel for Defendant Johnson, cited the non-exhaustive list of factors provided by the Fourth Circuit for determining the existence of exigent circumstances and argued that under these circumstances, no exigent circumstances existed upon arrival, and, thus, officers should have obtained a search warrant before entering the home. Counsel for Defendant Johnson specifically argued that the following facts support that exigent circumstances do not exist: the CAD Report shows that 9-1-1 dispatchers classified this as a non-emergent welfare check, when officers arrived on scene there were no signs of struggle, the alleged hostage victim reportedly had her cell phone and did not call 9-1-1 but, rather, called her husband, and the response directed to report to the scene was only three officers and more officers would have been directed or called in had there a real concern for a hostage situation. Counsel for Defendant Johnson reiterated Defendants' position that officers should have obtained search warrant prior to entry under these circumstances.

On rebuttal, counsel for the Government added that as a matter of policy, the exigent circumstances exception exists because there is not time for officers to go get a warrant first if there's a possibility that someone is being harmed – officers must search the home in order to protect public safety. The Government noted that the officers' subjective intent for entering the home is not of consequence where there is an objective basis for doing so. The Government challenged the notion that a subject can provide partial consent to an entrance of a residence and noted that as soon as officers entered the residence probable cause was established as the drugs were in plain view.

### III. APPLICABLE LAW

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. Const. amend. IV. Also, well-established is the exclusionary rule – that a court should exclude evidence obtained if an arrest or search is unlawful. <u>See</u> <u>Mapp v. Ohio</u>, 367 U.S. 643 (1961). However, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." <u>Hudson v. Michigan</u>, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

The undersigned also notes the well-established principle under the Fifth Amendment of the United States Constitution that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

## IV. LEGAL ISSUES AND ANALYSIS

The questions before the Court are (1) whether deputies' entrance into the home was lawful, either pursuant to the exigent circumstances exception or valid consent provided by Murray, as the entry led to deputies' discovery of evidence which served as the basis for the offenses charged; and (2) whether statements provided to police by Murray were voluntary or made under duress, without proper explanation of his legal rights.

Defendant contends the circumstances in this case "belie the existence of any real opportunity to consider or exercise his right against self-incrimination and his right against unreasonable searches and seizures." [ECF No. 53 at 2].

**A.    Entry into the trailer was permissible under the exigent circumstances exception; thus, the consent to the search, or lack thereof, is of no consequence.**

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." <u>United States v. Wilhelm</u>, 80 F.3d 116 (4th Cir. 1996). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." <u>Silverman</u>

24

v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961). Accordingly, "the Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). *See also* Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) (quoting United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972)).( "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."); United States v. Cephas, 254 F.3d 488, 494 (4th Cir. 2001)("Warrantless entries into a residence are presumptively unreasonable."). However, two notable exceptions allow warrantless entry of a person's home: (1) the existence of exigent circumstances and (2) a consent to search.

Exigent circumstances permit law enforcement to enter property and/or conduct a warrantless search outside the context of a criminal investigation. United States v. Taylor, 624 F.3d 626, 630-33 (4th Cir. 2010), cert. denied, 565 U.S. 925 (2011). Three broad categories of exigent circumstances serve as an exception to the Fourth Amendment's warrant requirement: (1) the "emergency aid" exception, permitting entry to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury," Kentucky v. King, 563 U.S. 452, 459-62 (2011) (citing Brigham City v. Stuart, 547 U.S. 398, 403 (2006)); (2) the "hot pursuit" exception, Id. (citing Brigham City, 547, U.S. at 403); and (3) "to prevent the imminent destruction of evidence," Id. (citing Georgia v. Randolph, 547 U.S. 103, 115, n.6; and Minnesota v. Olson, 495 U.S. 91, 100 (1990)).

"In analyzing whether exigent circumstances justified a warrantless search, we ask whether the circumstances would cause an officer to have an 'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons

or property within.' " United States v. Hill, 649 F.3d 258, 265 (4th Cir. 2011) (quoting United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992)).

The Fourth Circuit has provided factors relevant to a district court's finding of exigent circumstances: "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant, (2) the possibility of danger to police guarding the site, (3) the gravity of the offense involved, and (4) whether the suspect is reasonably believed to be armed." McCarn v. Beach, 91 F.3d 131 (4th Cir. 1996)(citing United States v. Reed, 935 F.2d 641, 642 (4th Cir.), *cert. denied*, 502 U.S. 960 (1991)). *See also* United States v. Turner, 650 F.2d 526 (4th Cir. 1981) (citing United States v. Rubin, 474 F.2d 262, 268 (3d Cir. 1973)). McCarn v. Beach, 91 F.3d 131 (4th Cir. 1996) (citing United States v. Reed, 935 F.2d 641, 642 (4th Cir.), *cert. denied*, 502 U.S. 960 (1991)); Leonard v. Starkey, No. 1:14-CV-42, 2017 WL 354850, at *7 (N.D.W. Va. Jan. 24, 2017)(Bailey, J.).

Alternatively, consent to enter and search a home is valid to support warrantless entry into a home if the government can "demonstrate the consent was, in fact, voluntarily given, and not the result of duress or coercion, express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). As in the issue of whether consent was given at all, the determination of whether a consent to search is valid is based upon the "totality of the circumstances." Id. at 227. Some of the factors which may be used in determining whether a consent to search was voluntary include: the consenter's age, education, maturity, intelligence, and experience, as well as the conditions under which the consent to search was given, such as the officer's conduct, the number of officers present, and the duration, location, and time of the encounter. United States v. Elie, 111 F.3d 1135 (4th Cir. 1997)(finding consent to be voluntary where at least six officers were present), *abrogated in part*

*on other grounds by* <u>Dickerson v. United States</u>, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

The voluntariness of consent to search is a factual question to be determined in light of the totality of the circumstances, and should be upheld unless clearly erroneous. <u>United States v. Gordon</u>, 895 F.2d 932, 938 (4th Cir.) <u>cert. denied</u> 111 S.Ct. 131 (1990). If challenged, the district court must determine, based upon the "totality of the circumstances," whether consent was knowing and voluntary, which the government must prove by a preponderance of the evidence. <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980); <u>United States v. Beckner</u>, 473 F.3d 551 (4th Cir. 2007).

Here, exigent circumstances justified the warrantless entry and search of the trailer because the circumstances lead deputies to the objectively reasonable belief that an emergency existed which required immediate entry to render assistance or prevent harm to the purported hostage Tara Emery. There are few circumstances that require a greater degree of urgency than a report of hostage being held at gunpoint. The "ultimate touchstone of the Fourth Amendment is . . . 'reasonableness.'" <u>Michigan v. Fisher</u>, 558 U.S. 45, 47 (2009)(internal citations omitted). "It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from" an emergency in pursuit of a search warrant. <u>Id</u>. In this instance, an objective belief that an emergency existed is supported by the fact that the husband caller provided his name, his wife's name and number and a personal call-back number, and the fact that details observed on-scene verified the information provided (Murray or "Seven" presence on the scene, the presence of a rental car, and the observation of a paddle holster).

Furthermore, to the extent that Defendants Murray and Johnson contends that officers exceeded the scope of the search appropriate either pursuant to consent or exigent circumstances,

this argument is without merit. It is generally true that "[a]ny search following warrantless entry for emergency reasons ... must then be limited by the type of emergency involved. It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." Taylor, 623 F.3d at 633 (quoting United States v. Moss, 963 F.2d 673 (4th Cir.1992). Indeed, "entry [must be] 'strictly circumscribed' by the exigency that led to it." Id. (quoting United States v. Gwinn, 219 F.3d, 326, 332(4th Cir.), *cert. denied*, 531 U.S. 1025 (2000)).

However, deputies may and must reasonably continue their search where the exigency, or lack thereof, is not found and resolved.  To illustrate, in Hunsberger v. Wood, § 1983 plaintiffs contended that even if an entry did not violate the Fourth Amendment under the exigent circumstances exception, the scope of the search was unreasonable where an officer, having found no vandalism or property destruction on the first floor, descended to the basement and ascended to the second floor. The Fourth Circuit found this argument to be without merit. Hunsberger v. Wood, 570 F.3d 546 (4th Cir. 2009). The Court explained:

> This argument is without merit. The fact that there was no evidence of vandalism in the main living area did not require the conclusion that all was well in the Hunsberger house. Vandals do not confine their search for valuables to downstairs rooms, nor do they rule the upstairs out of bounds for hiding or for inflicting serious harm on others they may happen upon in a house. It is not surprising, therefore, that plaintiffs do not point to precedent for the proposition they seek. Moreover, Wood did not locate the missing NW on the first floor, so that justification for his search remained. Nor did anything he saw on the first floor make clear who had been or remained in the house that night, and thus it was not unreasonable for him to continue searching in order to determine whether an unauthorized person was present.

Id. at 556.

Like Hunsburger, even though Murray stated "no one is bein' held hostage" and deputies did not immediately observe evidence of a hostage situation in the main living area or right bedroom, the facts did not require the conclusion that all was well in the rest of the trailer. Deputies did not know who may be present in the unexplored rooms of the house. It was reasonable, having

received a call which reliably identified tipster, who gave their name and a call-back number and having corroborating the rental car information on the scene, that officers has a valid justification to keep searching the home in order to determine if a woman was being held hostage. Accordingly, the undersigned **FINDS** deputies did not exceed the scope of an appropriate search, and as described above, their entry and search were justified due to exigent circumstances.

Having decided that exigent circumstances justified deputies' entry into and walk-through search of the trailer, the undersigned **FINDS** the issue of Murray's consent need not be addressed by the Court. The exigent circumstances permitted warrantless entry and search for the reported hostage regardless of Murray's consent or lack thereof. However, for thoroughness, while explicitly leaving open the issue, the undersigned would note that there are factors in this case that weigh for and against a finding of valid consent to search. Murray's experience with law enforcement, his familiarity with Deputy Ward, and his statement – "come on in, no one is bein' held hostage" – support a finding that consent to search was voluntarily given. However, the disorienting time and weather conditions and the deputies' intimidating conduct weigh against a finding of knowing, voluntary consent. Again, the issue of consent is inconsequential where deputies were otherwise justified in their entry and search based upon exigent circumstances.

> **B.**    **Statements provided by Defendant Murray were voluntary and given only after deputies advised him of his <u>Miranda</u> rights.**

Seminal caselaw provides that:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.

<u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). Thus, "[a] confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights

under <u>Miranda v. Arizona</u> . . . and the defendant knowingly, intelligently, and voluntary waives those rights." <u>United States v. Giddins</u>, 858 F.3d 870, 879 (4th Cir. 2017).

In determining whether deputies have satisfied <u>Miranda</u> when warning a suspect of his rights, the Supreme Court of the United States has never required deputies to adhere to an exact formulation or incantation of the "now familiar" Miranda warnings. *See* <u>Id.</u> ("[T]his Court has not dictated the words in which the essential information must be conveyed."); <u>Duckworth v. Eagan</u>, 492 U.S. 195, 203 (1989); <u>California v. Prysock</u>, 453 U.S. 355, 360 (1981) (per curiam)(officers must provide "the now familiar Miranda warnings ... *or their equivalent.*"); <u>United States v. Nash</u>, 739 F. App'x 762, 765 (4th Cir. 2018)("[T]he Supreme Court has repeatedly and plainly held that no specific language is required to satisfy Miranda."); <u>United States v. Frankson</u>, 83 F.3d 79 (4th Cir. 1996) ("[A]ll that police officers need to do is convey the general rights enumerated in <u>Miranda</u>.")

Requiring highly particularized warnings would pose an onerous burden on police officers. <u>United States v. Frankson</u>, 83 F.3d 79, 82 (4th Cir. 1996). An "officer in the field may not always have access to printed Miranda warnings, or he may inadvertently depart from routine practice, particularly if a suspect requests an elaboration of the warnings." <u>Duckworth</u>, 492 U.S. at 203. Therefore, a reviewing court "need not examine Miranda warnings as if construing a will or defining the terms of an easement[,]" <u>Id.</u>, and <u>Miranda</u> is satisfied as long as the warnings provided "reasonably convey to [a suspect] his rights." <u>Powell</u>, 559 U.S. at 60 (quoting <u>Duckworth</u>, 492 U.S. at 203). A suspect simply "must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be

appointed for him prior to any questioning if he so desires." Fla. v. Powell, 559 U.S. 50, 59–60 (2010)(citing Miranda 384 U.S. 436).

In determining the voluntariness of a statement, the court must examine "the totality of the circumstances," including defendant's characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview. United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987). The test of voluntariness is whether the defendant's will has been "overborne" or his "capacity for self-determination critically impaired." Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). Voluntariness is not, however, "to be equated with the absolute absence of intimidation," for under this test virtually no statement would be voluntary. United States v. Wertz, 625 F.2d 1128, 1134 (4th Cir.1980); United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997); Pelton, 835 F.2d at 1072. Further, the fact that guns are drawn by officers and/or a subject is placed into handcuffs does not *ipso facto* render any subsequent statement "involuntary." *See* United States v. Wertz, 625 F.2d 1128, 1137 (4th Cir. 1980), *cert. denied*, 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 136 (1981)(guns drawn); United States v. Seni, 62 F.2d 277, 281-282 (4th Cir. 1981)(guns drawn and handcuffs placed on suspect); United States v. Ogden, 572 F.2d 501, 503 (5th Cir. 1978), *cert. denied*, 439 U.S. 979, 99 S.Ct. 564, 58 L.Ed.2d 650 (1978)(handcuffs).

Further, the Fourth Circuit has recognized that a defendant's "subsequent willingness to answer questions after acknowledging [his] Miranda rights is sufficient to constitute an implied waiver." Frankson, 83 F.3d 79, 82 (4th Cir. 1996)(internal citations omitted). In Frankson, the court held that the defendant demonstrated a wiliness to answer question where, after being read his rights, officers "asked [Frankson] if he understood [those rights], [he] indicated that he did by answering yes" and proceeding to answer "at least three questions posed" by the officer. Id.

31

Here, the parties do not contest that Murray was in custody from the moment he exited the trailer. Accordingly, the undersigned will move forward to assess (1) whether the Murray was advised of his Miranda rights, and (2) whether he knowingly waived those rights and voluntarily provided statements to deputies.

First, as observed on the body camera,[13] Deputy Ward satisfied the requirements of Miranda and adequately advised Murray of his rights. Ward specifically advised Murray:

> Because you are sitting here in handcuffs . . . you do have the right to remain silent, anything you say can and will be used against you in a court of law, you have the right to an attorney, you have a right to have that attorney with you while being questioned, now or in the future. If you cannot afford an attorney, one will be appointed to represent you without cost. You have the right to stop answering questions at any time in order to consult an attorney. Do you understand your rights?

Murray immediately responded "yes" when asked if he understood his rights.

Establish precedent cautions this Court against drafting new and onerous Miranda standards for law enforcement officers. Such precedent also discourages rigorously scrutinizing the language or cadence used by officers when those officers have otherwise followed the beck and call of Miranda and advised the suspect of his right to counsel and his right against self-incrimination.

Here, Ward used identical language in his warning as used by the Supreme Court in Powell. His warning served to generally inform and advise Murray of his Fifth and Sixth Amendment rights. Defendant Murray now argues that these rights were recited too quickly by Ward and notes Ward did not stop between each sentence to ask Murray if he understood each of his rights. Even agreeing with the notion that Ward spoke quickly, the undersigned **FINDS** that Ward fully and clearly recited "the now familiar Miranda warnings ... or their equivalent" to Murray, who was

---

[13] *See* Government's Exhibit No. 1, Deputy Joshua Ward's Body Camera Footage.

subsequently asked if he understood those rights, to which Murray answered in the affirmative. The undersigned **FINDS** Ward reasonably and sufficiently conveyed to Murray his rights.

Second, Ward proceeded to question Murray, and Murray, having acknowledged his rights, answered the deputies' questions. While Murray was in handcuffs at all times of questioning, other factors indicate his statements were voluntary: the conversational nature of the discussion, Murray's willingness to answer deputies' question, deputies' statements and assurances to Murray that he was not under arrest at this time, and the fact that "[t]he interview took place on his turf[,]" Braxton, 112 F.3d 777, 783 (4th Cir. 1997). Murray does not allege that a lack of education, maturity, or intelligence deprived him of the ability to choose to remain silent. After "careful scrutiny of all the surrounding circumstances," Schneckloth, 412 U.S. at 226, 93 S.Ct. at 2047, the undersigned finds that Murray has not shown that his will was overborne or his capacity for self-determination critically impaired. The facts support that Murray's statements to the deputies were voluntary and made after he was advised of his Miranda rights. Accordingly, the undersigned **FINDS Defendant's Motion to Suppress** should be **DENIED**.

## IV. CONCLUSION

For the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion [ECF No. 53] be **DENIED.**

Any party shall have **ten**[14] days from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District

---

[14] Although parties usually have 14 days to respond to a Report and Recommendation such as this, that is a maximum time to respond, not a minimum. In this matter, the pretrial conference is scheduled for October 1, 2021 and the jury selection and trial for October 12, 2021.

Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted September 7, 2021.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE