IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


UNITED STATES OF AMERICA,

          Plaintiff,

v.                                    Crim. Action No. 1:20-CR-95
                                            (Judge Kleeh)
AARIC MURRAY and
RICHARD KIRKLAND JOHNSON,

          Defendants.


MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
OVERRULING OBJECTIONS [ECF NO. 74],
AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

Pending before the Court is a Report and Recommendation ("R&R") by United States Magistrate Judge Michael J. Aloi. The Magistrate Judge recommends that the Court deny the motion to suppress filed by Defendant Aaric Murray ("Murray") and joined by Defendant Richard Johnson ("Johnson") (together, "Defendants"). For the reasons discussed below, the Court adopts the R&R and **DENIES** the motion to suppress.

## I.   FACTS

The Court finds the following facts based on the testimony and arguments at the suppression hearing, all exhibits to the hearing, and the briefs filed by the parties. On April 16, 2020, at 5:33 a.m., MECCA 911 received a call from a man identifying himself as Eddie Emery. Mr. Emery reported that his wife, Tara

USA V. MURRAY ET AL.                                          1:20-CR-95

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

Emery, called him and told him that she been taken hostage and was being held at gunpoint by a man at 536 Independence Hills.[1]  Mr. Emery stated that a man at this residence would not return Mrs. Emery's rental car to her.  He believed that the man who was holding her at gunpoint went by the nickname "Seven."  Mr. Emery gave the 911 dispatcher his own phone number and Mrs. Emery's phone number.

Deputies Ward, Fitzwater, and Alexander with the Monongalia County Sheriff's Office ("MCSO") were dispatched to the reported residence – 536 Independence Hills Village, Morgantown, West Virginia 26501 (the "residence") – for a welfare check.  Deputy Ward knew that Murray went by the nickname "Seven" and was familiar with Murray from previous interactions.[2]

The deputies arrived at the residence approximately 15 minutes after receiving the dispatch.  They attempted to call Mr. Emery several times to get more information, but they were unable to reach him.  As the deputies approached the residence, they

---

[1] This is a location in Morgantown, West Virginia.
[2] Deputy Ward testified that he has arrested Murray two or three times in the past.  During one previous interaction with Murray, when Murray had an active capias, Deputy Ward approached Murray to arrest him, and he noticed a loaded heroin needle in Murray's arm.  Murray then raised the loaded needle in what looked to Deputy Ward like an attempt to "stick him" with it.  Deputy Ward has also interacted with Murray during other police calls where firearms were involved.

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

observed a grey-silver vehicle outside.  The deputies called in the vehicle's information and received confirmation that it was, in fact, a rental vehicle.  Deputies Ward and Fitzwater approached the front of the residence with weapons drawn, while Deputy Alexander covered the exits at rear of the residence.  The deputies were unable to see into the residence because the windows were internally covered by blankets and plastic.  It was around 30 degrees outside and still dark.

The deputies knocked on the front door and announced their presence.  After a noticeable delay, Murray answered the door and exited the residence.  Deputy Ward ordered Murray to face the residence and place his hands over his head.  He immediately placed Murray in handcuffs.  Deputy Ward explained to Murray that he was not under arrest, that he was being detained, and that the deputies were investigating a report that someone was being held hostage at gunpoint by Murray at this residence.  Deputy Ward did a pat-down of Murray and felt what he recognized to be large bundles of cash.

The deputies called a second occupant out from the back hallway of the residence onto the porch.  The man was detained, handcuffed, and later identified as Johnson.  Deputy Ward asked Murray, "Can we step inside out of the cold real quick, guys?" Murray answered "Yeah," and said, "No one is bein' held hostage."

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

Deputy Ward testified that he would not have gone into the trailer if Murray had not consented.  He did not see any signs of a woman at the residence, such as women's clothing; he saw no signs of a struggle outside; and he did not hear any cries for help.

The deputies, as well as Murray and Johnson, entered the residence.  Deputy Ward directed Murray to step into an open room on the right, which was visible from the entryway: "Let's step in here, man."  Murray responded, "Okay," walked into the room, and took a seat at a chair in front of a table.  Deputy Ward observed, in plain view, drug distribution paraphernalia around the room and on the table in front of Murray, including digital scales, baggies with their corners cut, white powdery residue, a paddle holster to a firearm, gloves, rubber bands, baking soda, cutting agents, ledgers, and notebooks.  Deputy Ward also observed what he believed to be a large bag of crack cocaine.  Deputy Ward then, with Murray's permission, walked through the residence to search for the purported female hostage victim.  No such female was found in the residence.

After completing the search for a hostage and finding no one, Deputy Ward stepped outside of the residence and called Lieutenant Todd Forbes of the Drug Task Force to report the observed drug

USA V. MURRAY ET AL.                                                1:20-CR-95

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

distribution evidence and ask whether to pursue a narcotics investigation.

Deputy Ward returned inside the residence. He recited Murray's Miranda rights to him and asked Murray if he understood his rights. Murray replied, "Yeah." Deputy Ward asked Murray questions about Mrs. Emery and the relationship between Mrs. Emery and her husband. He asked Murray if he believed it was possible that Mrs. Emery was trying to extort money from her husband. Deputy Ward also asked Murray if he was ready to talk about the "elephant in the room." Deputy Ward gestured to the table and clarified for Murray that he meant "the cutting agent, the baggies . . . the big wad of cash in your pocket." Murray responded, "My girlfriend uses."

Deputy Ward directed Deputy Alexander to perform a search of Murray to ensure that he was not concealing any other contraband on his body. Murray told Deputy Alexander that he had approximately $4,000 on his person. Murray continued to converse with and field questions from the deputies. At some point, he told Deputy Ward that he was living in the residence. The deputies discovered that Murray had an active capias warrant on shoplifting charges from Westover, West Virginia. Murray was then arrested and taken back to the police station by Deputy Ward. MCSO deputies

USA V. MURRAY ET AL.                                      1:20-CR-95

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],**
**OVERRULING OBJECTIONS [ECF NO. 74],**
**AND DENYING MOTION TO SUPPRESS [ECF NO. 53]**

secured the scene. They then sought and obtained a search warrant for the residence and the rental vehicle.

The search of the residence yielded several guns, some of which were stolen; approximately one ounce of methamphetamine; several grams of crack cocaine; approximately $9,000 cash; and the previously-described drug distribution paraphernalia. Johnson was also arrested and taken back to the police station. When searching the rental vehicle, deputies found baggies with methamphetamine residue in them. The driver's seat was pushed all the way back, and there was a knife stuck in between the driver's seat and the center console.

A federal Criminal Complaint was filed against Murray on November 12, 2020. An Indictment was returned by a Grand Jury against Murray on December 1, 2020, and a Superseding Indictment,[3] based in part on the seizure of the items listed, was subsequently returned by a Grand Jury against Murray and Johnson on February 2, 2021.

---

[3] The Superseding Indictment alleges the following: (I) Conspiracy to Distribute Controlled Substances (Murray and Johnson); Aiding and Abetting the Possession with Intent to Distribute Methamphetamine (Murray and Johnson); (III) Aiding and Abetting the Possession with Intent to Distribute Heroin (Murray and Johnson); (IV) Aiding and Abetting the Possession with Intent to Distribute Cocaine Base (Murray and Johnson); (V) Unlawful Possession of a Firearm (Murray); (VI) Aiding and Abetting the Possession of Firearms in Furtherance of a Drug Offense (Murray and Johnson); (VII) Possession with Intent to Distribute Fentanyl (Johnson); and (VIII) Unlawful Possession of a Firearm (Murray).

USA V. MURRAY ET AL.                                          1:20-CR-95

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

## II.  ARGUMENTS BY THE PARTIES

In the motion to suppress, Defendants argued that MCSO deputies should have obtained a warrant before entering the residence. Defendants focused on Murray's lack of valid consent to a search of his home. They further argued that Murray made potentially incriminating statements to officers while under duress and was not properly advised of his rights.

In response, the Government argued that exigent circumstances justified warrantless entry into the residence. As soon as the officers entered the residence, drug paraphernalia was in plain view, which gave the deputies probable cause to support warrants to search the residence and the vehicle. The Government further stated that Murray received a Miranda warning before making any potentially incriminating statements. During the hearing on the motion to suppress, the Government additionally argued that Murray gave valid consent to the deputies to search his residence.

In reply, Defendants emphasized the nature of the deputies' actions at the residence, stating that the actions were "calculated to demoralize, frighten, intimidate, and humiliate." Further, Defendants argued that even if exigent circumstances existed, they "expired very soon after their arrival, but the detention,

USA V. MURRAY ET AL.                                    1:20-CR-95

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],**
**OVERRULING OBJECTIONS [ECF NO. 74],**
**AND DENYING MOTION TO SUPPRESS [ECF NO. 53]**

interrogation and inspection of the premises extended much longer."

### III. <u>REPORT AND RECOMMENDATION</u>

The R&R recommended that the Court deny the motion to suppress because exigent circumstances justified warrantless entry of the residence. After entering the residence, the drug paraphernalia in plain view gave the deputies probable cause to support the warrant for a search. The R&R further found that any potentially incriminating statements made by Murray were not solicited in violation of his Fifth Amendment rights because he was properly advised of them under <u>Miranda</u>. Because the Magistrate Judge found that exigent circumstances existed, the R&R did not address the issue of consent.

The R&R advised the parties that they had ten days to file "specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection." The R&R further stated that "[f]ailure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals."

USA V. MURRAY ET AL.                                          1:20-CR-95

MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
OVERRULING OBJECTIONS [ECF NO. 74],
AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

IV.   OBJECTIONS

Johnson filed Objections to the R&R, and Murray joined in the
Objections.  While Johnson identified three legal issues,[4] he only
made one substantive objection, which was an objection to the
Magistrate Judge's finding that exigent circumstances existed to
justified warrantless entry of the residence.

When reviewing a magistrate judge's R&R, the Court must review
de novo only the portions to which an objection has been timely
made.  28 U.S.C. § 636(b)(1)(C).  Otherwise, "the Court may adopt,
without explanation, any of the magistrate judge's
recommendations" to which there are no objections.  Dellarcirprete
v. Gutierrez, 479 F. Supp. 2d 600, 603–04 (N.D.W. Va. 2007) (citing
Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983)).  Courts will
uphold portions of a recommendation to which no objection has been
made unless they are clearly erroneous.  See Diamond v. Colonial
Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005).

Because no party has objected to the Magistrate Judge's
findings regarding the voluntariness of Murray's potentially
incriminating statements, the Court is under no obligation to
conduct a de novo review with respect to this portion of the R&R.

---

[4] Johnson identified the legal issues as (1) valid consent, (2) exigent
circumstances, and (3) voluntariness of Murray's statements.

USA V. MURRAY ET AL.                                          1:20-CR-95

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

Accordingly, the Court reviewed the remainder of the R&R for clear error.  Upon careful review, and finding no clear error, the Court adopts the portion of the R&R pertaining to the Fifth Amendment, Miranda warnings, and Murray's potentially incriminating statements.  Murray was properly advised of his rights before he made potentially incriminating statements, if any, to the deputies.

### V.   ANALYSIS

Exigent circumstances justified the deputies' warrantless entry of the residence.  After entering the residence, the drug paraphernalia and items believed to be drugs created probable cause to support a warrant.

"The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." United States v. Wilhelm, 80 F.3d 116, 120 (4th Cir. 1996).  "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961).  Accordingly, "[t]he Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],**
**OVERRULING OBJECTIONS [ECF NO. 74],**
**AND DENYING MOTION TO SUPPRESS [ECF NO. 53]**

However, officers may enter a home without a warrant when exigent circumstances exist.  See  United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2013) (citation omitted) ("The rationale underpinning the exigent circumstances doctrine is that when faced with an immediate and credible threat or danger, it is inherently reasonable to permit police to act without a warrant.")

The United States Supreme Court has listed three broad categories of exigent circumstances that serve as exceptions to the Fourth Amendment's warrant requirement: (1) the "emergency aid" exception, permitting entry to "render emergency assistance to an injured occupant or to protect an occupant from imminent injury"; (2) the "hot pursuit" exception; and (3) "to prevent the imminent destruction of evidence."  Kentucky v. King, 563 U.S. 452, 459-62 (2011) (citations omitted).

The Fourth Circuit has provided a non-exhaustive list of factors relevant to a district court's finding of exigent circumstances: "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant, (2) the possibility of danger to police guarding the site, (3) the gravity of the offense involved, and (4) whether the suspect is reasonably believed to be armed."  McCarn v. Beach, 91 F.3d 131 (4th Cir. 1996) (unpublished) (citing United States v. Reed, 935 F.3d 641, 642 (4th Cir. 1992),

USA V. MURRAY ET AL.                                        1:20-CR-95

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],**
**OVERRULING OBJECTIONS [ECF NO. 74],**
**AND DENYING MOTION TO SUPPRESS [ECF NO. 53]**

cert. denied, 502 U.S. 960 (1991)).  In addition, the Supreme Court and the Fourth Circuit have recognized that "more general 'emergencies,' if enveloped by a sufficient level of urgency, may also constitute an exigency and justify a warrantless entry and search."  Yengel, 711 F.3d at 397 (citing Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).

"In analyzing whether exigent circumstances justified a warrantless search, we ask whether the circumstances would cause an officer to have an 'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.'"  United States v. Hill, 649 F.3d 258, 265 (4th Cir. 2011) (citation omitted).  The officers' conduct must be "tied to objective facts that sufficiently increase the likelihood, urgency, and magnitude of the threat to the level of an emergency."  Yengel, 711 F.3d at 396.

Once entry based on exigent circumstances is made, any search "must then be limited by the type of emergency involved.  It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry."  United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992) (citation omitted).  A "warrantless search must be 'strictly circumscribed' by the exigency that justifies

12

USA V. MURRAY ET AL.                                    1:20-CR-95

**MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
OVERRULING OBJECTIONS [ECF NO. 74],
AND DENYING MOTION TO SUPPRESS [ECF NO. 53]**

the exception to the warrant requirement." United States v. Gwinn, 219 F.3d 326, 332 (4th Cir. 2000) (citation omitted).

The Fourth Circuit has recognized the serious, emergency-like nature of hostage situations and has even mused that in some circumstances they could excuse the knock-and-announce requirement.  See Bellotte v. Edwards, 629 F.3d 415, 423 (4th Cir. 2011) ("Certainly, we can imagine actual or threatened injuries to hostages or other third parties that might excuse the knock-and-announce requirement.").  It has also recognized that exigent circumstances can exist if there is a risk of a developing hostage situation.  See United States v. Wilhelm, 358 F. App'x 452, 455 (4th Cir. 2009) (noting that "withdrawal from the search could have resulted in a hostage situation or posed danger to the officers").

Here, the Court agrees with the Magistrate Judge that exigent circumstances justified the MCSO deputies' entry of the residence without a warrant.  Defendants do not appear to contest whether a hostage situation can create exigent circumstances.  What Defendants seem to argue is that in this situation, the deputies' belief in the exigent nature of the purported hostage situation was unreasonable.  The Court disagrees.

The MCSO deputies had received a report of a hostage situation.  Mr. Emery — not an anonymous caller — had reported

USA V. MURRAY ET AL.                                    1:20-CR-95

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],**
**OVERRULING OBJECTIONS [ECF NO. 74],**
**AND DENYING MOTION TO SUPPRESS [ECF NO. 53]**

that Mrs. Emery, his wife, was being held at gunpoint at 536 Independence Hills. He stated that a man at this residence would not return her rental car to her. Mr. Emery believed that the man who was holding his wife at gunpoint was known as "Seven." He gave the 911 dispatcher his own phone number and his wife's phone number. Non-anonymous tips, of course, are inherently more reliable than anonymous reports of suspected criminal activity where the tipster does not face consequences for fabricating events and engaging law enforcement under false pretenses. See Adams v. Williams, 407 U.S. 143, 146-47 (1972) (observing that identified informants face potential criminal consequences under state law for false complaints); see also W. Va. Code § 15-3D-8 (criminalizing false missing person complaints).

When the officers arrived at 536 Independence Hills, they noticed a vehicle in the driveway. The deputies gained knowledge that the vehicle was, in fact, a rental car, which corroborated part of the tip from Mr. Emery. When the deputies knocked on the door of the residence, they could hear individuals moving around inside, but the individuals delayed their answering the door. In addition, blankets and plastic were covering the windows of the residence from the inside.

At this point, independent facts supported the reports of a

14

USA V. MURRAY ET AL.                                          1:20-CR-95

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],**
**OVERRULING OBJECTIONS [ECF NO. 74],**
**AND DENYING MOTION TO SUPPRESS [ECF NO. 53]**

hostage situation stemming from a dispute over a rental car, and the deputies had an objectively reasonable belief that an emergency existed. The facts known to the deputies were further corroborated when Murray answered the door. Deputy Ward knew that the 911 report was in reference to Murray, due to his knowledge of Murray's nickname: "Seven." When Murray answered the door, this affirmed for Deputy Ward the information relayed by the 911 dispatcher.

Defendants have argued it was unreasonable to believe an emergency existed for several reasons. For instance, Defendants have implied that a true hostage situation would have required the presence of a SWAT team. They also argued that the visit's categorization as a "welfare check" supports a finding that exigent circumstances did not exist. Defendants have pointed out that there was no way to know that Mr. Emery was the person he represented himself to be and that he never answered the return calls. They further argued that while the officers saw a rental car, they never determined who rented it.

Defendants have stated that after the officers removed Murray and Johnson from the residence, "[t]here was no reason to believe a woman had been injured," asserting that "[t]here was no reason to believe they had another accomplice." Defendants also argued that the report was "not credible in the first place because she

15

USA V. MURRAY ET AL.                                          1:20-CR-95

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

(according to the caller's false narrative) had the ability to call her own husband from a phone."

Evidence in support of Defendants' arguments is noticeably absent from the record. For instance, Defendants insinuate that a true hostage situation would require the presence of a SWAT team, so the situation was not an emergency and was not treated as such. The only evidence before the Court related to hostage-situation protocol, however, is the testimony of Deputy Ward, a portion of which is included below:

> Q. So you're on regular patrol this night?
>
> A. Correct.
>
> Q. So are all the other officers?
>
> A. Correct.
>
> Q. Are you trained in hostage negotiations?
>
> A. I am.
>
> Q. Are you part of the SWAT team?
>
> A. Yes.
>
> Q. And was this a normal response for a hostage situation with a gun?
>
> A. It is before you confirm that that's what you actually have.
>
> Q. But I mean three officers at the end

USA V. MURRAY ET AL.                                        1:20-CR-95

> of their shift, regular patrol, show up,
> knock and announce, for an active
> hostage gun situation?
>
> A. Correct. There is limited resources in
> Mon County and we don't call out an
> entire SWAT team and hostage negotiators
> for a situation that we're not certain is
> a hostage situation.
>
> Q. Okay. So you're saying you went in
> thinking this could be the real deal?
>
> A. Could be, yes.

See Hearing Transcript, ECF No. 73, at 26:2-22.  Without any

evidence in the record contradicting this testimony, the Court is

certainly not going to find that that the MCSO's response to a

hostage report was inappropriate or in any way indicative of a

belief that the situation was not an emergency.

    Further, to the extent that Defendants try to characterize

the visit as non-exigent because the 911 center labeled it as a

"welfare check," again, the only evidence before the Court

regarding "welfare checks" is the testimony provided by Deputy

Ward:

> Q. And when you get that call, what do they
> tell you the call is for?
>
> A. It's a welfare check, reference a female
> possibly being held hostage at gunpoint by a
> male named Seven over something to do with a
> rental car.

USA V. MURRAY ET AL.                                    1:20-CR-95

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

> Q. Okay. So the welfare -- whenever it says
> welfare check, just for the record, I like the
> record to be complete, what does that mean to
> you? What's a welfare check?
>
> A. A welfare check could be anything. I use it
> kind of broad and it's actually up to the 911
> dispatcher how they label the call, so it's
> how they take it in. So it could be anything
> from, hey, I haven't heard from my family
> member in a few days to, hey, somebody's in
> danger of losing their life.
>
> Q. Okay. Is there an option for a kidnapping
> or something like that or –
>
> A. I'm sure –
>
> Q. -- gun to their head option?
>
> A. I'm sure there is. I haven't -- you know –
>
> Q. You're not the one that chose it, right?
>
> A. Correct.
>
> Q. But the 911 dispatcher chose this more
> generic welfare check, correct?
>
> A. Yes.

Id. at 42:5–43:2.  Again, the Court, without evidence to the

contrary, will not find that the report should have been

categorized another way or that the categorization indicates a

lack of emergency.  Based on the information known to the deputies

before entering the residence, the Court finds the belief in an

emergency was reasonable.

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

The officers' conduct was "tied to objective facts that sufficiently increase the likelihood, urgency, and magnitude of the threat to the level of an emergency." See Yengel, 711 F.3d at 396. The objective facts include the following: Mr. Emery's report that his wife was being held hostage at gunpoint at 536 Independence Hills by a man known as "Seven" due to a dispute over a rental car; Mr. Emery's providing of his name, his wife's name, his phone number, and his wife's phone number; the presence of a rental vehicle at 536 Independence Hills; blankets and plastic covering the residence's windows; and Murray, whom Deputy Ward knew to have the nickname "Seven," answering the door.

Further, the warrantless search that ensued was "'strictly circumscribed' by the exigency that justifie[d] the exception to the warrant requirement." See Gwinn, 219 F.3d at 332. Deputy Ward's initial search through the residence was for the purpose of finding the purported hostage. He did not search spaces that were too small to hide a human.[5] After that, he turned to the "elephant in the room," which was the drugs and drug paraphernalia in plain view.

---

[5] Defendants initially challenged Deputy Ward's opening of the washer and dryer, but Deputy Ward testified that he has previously found people hiding in dryers. The Court finds his testimony uncontradicted and credible.

USA V. MURRAY ET AL.                                          1:20-CR-95

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

In their Objections, Defendants primarily relied on United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2013). This case, however, is easily distinguishable from the situation at hand. In Yengel, law enforcement arrived at a home in response to a report of domestic assault. Id. at 394. While at the home, the occupants told law enforcement that there was a grenade in a closet. Id. at 394-95. Without gaining any additional information about the grenade, the officers pried open the closet door with a screwdriver. Id. at 395. Inside the closet were other unlawful items that were seized, but no grenade. Id. The Fourth Circuit affirmed the district court's finding that exigent circumstances did not exist, and the officers should not have entered the closet without a warrant. Id. at 400.

The Yengel Court relied on a few specific facts to determine that no emergency existed. First, the Court noted that the alleged grenade was an "inert" device, which was stable, so the danger was "quite limited." Id. at 398. Here, the circumstances were much different: the danger involved when a woman is being held at gunpoint is unpredictable, and, quite possibly, ongoing. Second, the Court noted that the grenade was immobile and inaccessible because it was in the closet. Id. at 398-99. Here, officers received a report that the woman was being held hostage inside the

USA V. MURRAY ET AL.                                          1:20-CR-95

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],**
**OVERRULING OBJECTIONS [ECF NO. 74],**
**AND DENYING MOTION TO SUPPRESS [ECF NO. 53]**

residence; she could have been anywhere in the home. Finally, in Yengel, the Court found that there was no emergency because, in part, the officers did not evacuate the home after learning of the alleged grenade. Id. at 399. Here, the occupants of the residence were detained. They were detained before drugs and drug paraphernalia were noticed. While a full evacuation might not be contemplated in the same way as it may have been in a grenade situation, the deputies in this case treated the situation as an emergency.

The exigent circumstances continued until Deputy Ward finished his initial search of the residence. Not until he finished his initial search of the residence was he sure that Mrs. Emery was not in danger inside the residence. Contrary to Defendants' arguments, the mere detention of Murray and Johnson upon arrival at the residence did not eliminate all potential threats to Mrs. Emery. As the Magistrate Judge noted, the deputies were not required to halt their search after Murray and Johnson were detained. Similarly, the deputies were not required to halt their search after Murray said that "no one was bein' held hostage" or after they found no evidence of a hostage situation in the rooms initially entered.

The deputies were justified in searching the entire house for

USA V. MURRAY ET AL.                                    1:20-CR-95

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

a hostage, and Fourth Circuit precedent supports this concept. In

Hunsberger v. Wood, the officers had a reasonable belief that a

home was being vandalized and that a missing teenage girl was

inside the home in need of assistance, and officers entered the

home without a warrant. 570 F.3d 546, 549 (4th Cir. 2009). The

Court found that exigent circumstances existed, and the officers

were not required to stop their search after finding no evidence

of vandalism on the first floor:

> The fact that there was no evidence of
> vandalism in the main living area did not
> require the conclusion that all was well in
> the Hunsberger house. Vandals do not confine
> their search for valuables to downstairs
> rooms, nor do they rule the upstairs out of
> bounds for hiding or for inflicting serious
> harm on others they may happen upon in a house.
> It is not surprising, therefore, that
> plaintiffs do not point to precedent for the
> proposition they seek. Moreover, Wood did not
> locate the missing NW on the first floor, so
> that justification for his search remained.
> Nor did anything he saw on the first floor
> make clear who had been or remained in the
> house that night, and thus it was not
> unreasonable for him to continue searching in
> order to determine whether an unauthorized
> person was present. As soon as Wood realized
> that the Hunsbergers were at home, he ended
> his search and, after explaining to the
> homeowners why he had entered, left the house.

Id. at 556. Here, likewise, it was reasonable for deputies to

enter the residence and search its entirety for the purported

USA V. MURRAY ET AL.                                    1:20-CR-95

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],**
**OVERRULING OBJECTIONS [ECF NO. 74],**
**AND DENYING MOTION TO SUPPRESS [ECF NO. 53]**

hostage.

The Court notes that it is irrelevant that the deputies asked for consent to enter the residence and then asked for consent to search the residence.  The consent was unnecessary because, from an objectively reasonable officer's perspective, exigent circumstances existed.  It is likewise irrelevant that the deputies commented on the cold weather when they asked to come inside because, again, consent was unnecessary.

Finally, it is irrelevant that Deputy Ward testified that if Murray had said no, he would not have gone in the residence.  "The officer's subjective motivation is irrelevant."  Brigham City, 547 U.S. at 404 (citations omitted); see also Wren v. United States, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers[.]"); Graham v. Connor, 490 U.S. 386, 397 (1989) ("[O]ur prior cases make clear [that] the subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment.").

Again, "objective reasonableness" is the guiding standard. See Graham, 490 U.S. at 388.  "To gauge objective reasonableness, a court examines only the actions at issue and measures them

USA V. MURRAY ET AL.                                          1:20-CR-95

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

against what a reasonable police officer would do under the circumstances. . . . Subjective factors involving the officer's motives, intent, or propensities are not relevant." Rowland v. Perry, 41 F.3d 167, 172-73 (4th Cir. 1994).  After the deputies entered the residence, which they could lawfully do without a warrant for the reasons discussed above, drug paraphernalia and items believed to be drugs were in plain view.[6]

The Court, as required when presented with a request to suppress evidence, must be mindful that the purpose of the "exclusionary rule" is to deter law enforcement misconduct outside Constitutional constraints.  That interest must be balanced against the costs.  As this Court has previously observed,

> The exclusionary rule is a drastic remedy that exacts a high social cost. See Nix v. Williams, 467 U.S. 431, 442 (1984); Rakas v. Illinois, 439 U.S. 128, 137 (1978) (recognizing that "[e]ach time the exclusionary rule is applied it exacts a substantial social cost for the vindication of Fourth Amendment rights.").  "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free — something that 'offends basic concepts of the criminal justice system.'" Herring v. U.S., 555 U.S. 135, 141 (2009) (quoting Leon, 468 U.S. at 908).

---

[6] Because the officers were lawfully inside the residence, the officers could have seized the drug-related items in plain view and, most certainly, could have used them (as they did) to support a warrant to search the rest of the residence. See United States v. Jackson, 131 F.3d 1105, 1108-09 (4th Cir. 1997) (discussing the plain view doctrine).

USA V. MURRAY ET AL.                                         1:20-CR-95

### MEMORANDUM OPINION AND ORDER
### ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],
### OVERRULING OBJECTIONS [ECF NO. 74],
### AND DENYING MOTION TO SUPPRESS [ECF NO. 53]

> Consequently, defendants seeking to invoke the exclusionary rule face a "high obstacle" due to "the rule's costly toll upon truth-seeking and law enforcement objectives." Id. (quoting Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 364–65 (1998)). The paramount purpose of the exclusionary rule is deterrence; ultimately, courts should only apply the exclusionary rule when "the benefits of deterrence [ ] outweigh the costs." Id. (citing Leon, 468 U.S. at 910).

United States v. Lough, 221 F. Supp. 3d 770, 780 (N.D.W. Va. 2016) (Keeley, J.), aff'd, 721 F. App'x 291 (4th Cir. 2018). The Supreme Court has instructed that "the deterrent effect is higher where law enforcement conduct is more culpable." United States v. Davis, 690 F.3d 226, 251 (4th Cir. 2012) (discussing Herring v. United States, 555 U.S. 135, 143 (2009)). Here, law enforcement's conduct was permissible under the exigent circumstances exception to the Fourth Amendment's warrant requirement, and no desirable deterrent effect can be derived by the exclusion of properly-discovered evidence.

### VI.   CONCLUSION

For the reasons discussed above, the R&R is adopted, and Defendants' Objections are overruled. The MCSO deputies did not violate Defendants' Fourth or Fifth Amendment rights. Their entry into the residence was lawful under the exigent circumstances exception to the Fourth Amendment's warrant requirement. After

USA V. MURRAY ET AL.                                      1:20-CR-95

**MEMORANDUM OPINION AND ORDER**
**ADOPTING REPORT AND RECOMMENDATION [ECF NO. 72],**
**OVERRULING OBJECTIONS [ECF NO. 74],**
**AND DENYING MOTION TO SUPPRESS [ECF NO. 53]**

entering the residence, the items in plain view provided probable cause to support the warrant application. Finally, incriminating statements, if any, made in response to the deputies' questions were not solicited in violation of Murray's Fifth Amendment rights.

The Court **ORDERS** the following:

- The R&R is **ADOPTED** [ECF No. 72];

- The Motion to Adopt Objections to the R&R is **GRANTED** [ECF No. 75];

- The Objections to the R&R are **OVERRULED** [ECF No. 74]; and

- The Motion to Suppress is **DENIED** [ECF No. 53].

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Memorandum Opinion and Order to counsel of record and all appropriate agencies.

DATED: February 7, 2022

/s/ Thomas S. Kleeh
THOMAS S. KLEEH
UNITED STATES DISTRICT JUDGE